Case number 22-5794, Joseph Mattingly v. RJ Corman Railroad Group, LLC, et al. Oral argument not to exceed 15 minutes per side. Joseph Mattingly III for the appellant. You may proceed. It please the court, Mr. Lewis, Mr. O'Brien, Joseph Mattingly for the appellant, Joseph Brent Mattingly. We have reserved four minutes for rebuttal, Your Honor. Your Honors, this appeal presents the issue, among others, of whether a railroading company may shield itself from liability under the Federal Employers Liability Act from injuries suffered by the very kind of worker who has historically and traditionally been entitled to seek remedies under FELA by nominally segregating certain railroad functions into entities separated only by corporate charter from its railroads. The United States Supreme Court has defined the limits of the types of common carriers that are subject to FELA for injuries to their employees. First, under the principle that the district court in this case characterized as the Unitary Operations Principle, which is based on the Federal FELA statutory framework, where a parent owns, manages, and controls substantial common carrier subsidiaries in conjunction with purportedly non-common carrier subsidiaries as an organized unitary railroad system. The focus under this principle is on the structure and operation of the organization and the control exerted by the parent holding company over its subsidiaries. Second, under the common law, FELA liability can be extended to a subservient under the dual control of both the railroad and his nominal employer. The focus under this principle is on the direct relationship and the right to supervision of the injured employee by both the railroad and the nominal employer. While the analysis under both principles is highly fact-intensive, even under that fact-intensive analysis, the facts bearing upon the Unitary Organization Principle in this case are so compelling that the district court should have ruled as a matter of law that FELA applies. At a minimum, the facts under both the Unitary Operations Principle and under the common law principles, when considered in a light most favorable to Mr. Mattingly, clearly precluded summary judgment in favor of Corman. The district court, in evaluating these facts, considered those disputed facts singularly and concluded that none, standing alone, were either conclusive or determinative. Where there were admittedly conflicting facts that bore upon the issues, the district court, rather than viewing those facts in a light most favorable to Mr. Mattingly as it was required to do, instead resorted to context to find for Corman in this case. Your honors, even if we look to the originalism theory of interpreting statutes, Congress in 1908, when it adopted FELA, could not have contemplated that a track, bridge, or trestle worker on a railroad would not be covered by FELA. And I say this because, first of all, it's logical as to what railroads did in 1908, but on the further fact that for over 100 years since the adoption of FELA in 1908, not a single case can be found where a track, bridge, or trestle worker who was injured was denied FELA liability because of his employment by a purportedly non-common carrier. Only in the last five or six years do we see a few cases where that issue has arisen when we have seen the focus and the change in railroad work where, like in this case, Corman segregated portions of its railroading business or resorted to some subcontractors to do traditional railroading work. For over 100 years we cannot find a reported decision where a bridge, trestle, or track employee who was injured was denied FELA because he was purportedly working for a non-common carrier. So, even in that context, the type of work that Mr. Mattingly was doing has traditionally and historically always been subject to the remedies that are provided by FELA. Well, Mr. Mattingly, let me ask you, be that as it may, with respect to the facts here, we know that Corman Services was providing the type of work that you're talking about and that they were the default company, if you will, to provide that for Corman Group. What I'm struggling with is whether or not their provision of that work was necessary to the functioning of the Corman system, so to speak, because it's clear that they were not the exclusive company, for instance, that provided that type of work for Corman Group, correct? That is true, Judge Davis. Are there any facts in the record that would give us some indication of even maybe what percentage of the track and bridge work that Corman Group needed? What percentage of that work was being performed by Corman Services? Judge Davis, I think there are two references in the record that go to that. One reference is the testimony of Mr. Mattingly himself who testified that in his recollection over eighty or ninety percent of the bridge work that Corman Services did was for Corman Group Railroads. The second part of that testimony or the second piece of evidence that's in the record is the testimony of Dickie Dillon who was the Corman Services supervisor. And Mr. Dillon testified that in his experience, even though Corman Group's Railroads may bid out bridge work and things of that nature, it was common knowledge that Corman Services was going to get the work and he testified that he could not recall an instance where someone other than Corman Services did bridge work for the Corman Group of companies. Now, there is conflicting evidence by virtue of an affidavit that was submitted with the motion for summary judgment by Corman where an official from Corman says that Corman Services in general, not specifically just the bridge group, but Corman Services provided only a small percentage of its revenue for work on Corman Group tracks, bridges, and the like. Two things with respect to that affidavit and that notion which is contrary to the deposition testimony of both Dickie Dillon and Mr. Mattingly himself. First of all, unfortunately because of the procedural posture of this case, a lot of the discovery that would have been necessary to evaluate the relationship specifically between the Corman Services group and the Memphis Line Railroad here was denied to plaintiffs because the judge in the district court determined that only if Memphis Line later became a party would that type of discovery be permitted. And as we pointed out in the briefs, the order permitting Memphis Line to be joined as a party was entered only after all of the proof and briefing schedules had passed in this case. Yet the district court granted summary judgment for Memphis Line even though there was no pending motion for it. The second thing about that affidavit that talks about services and the revenues themselves, it's important to recall that under Corman Group's rules between their intercompanies, Corman Services could not charge more than its cost to any of the Corman Railroads, which begs the question, is Corman Services providing work or are they just providing workers for Corman Group Railroads? So those two pieces of evidence, Judge Davis, are in the record. So that sounds to me like there was kind of a reciprocal Corman Services had a kind of a preferred provider status. These are my terms. I know these aren't terms that are in the pleadings or anything like that. And conversely, in terms of the financial structure, Corman Group was going to receive if you will, kind of discounted services. And I use the term discounted rather loosely, but if it were not Corman Services, they would have paid a lot more because they wouldn't have had this arrangement. So they kind of had some mutual benefits there, correct? Sure, and I'm not sure I would characterize it as mutual benefits because the detriment is to Corman Services who can provide workers but can't charge what they would normally charge to someone else for that same work because under the inter company agreement, they charge only their actual cost, which is emblematic of the overall control of Corman Group of all of these subsidiaries. We have pointed out policies, we've pointed out things that even though Corman Group denies that written policies were followed, in some cases, particularly in the financial parts of their operation, they acknowledge that from a practical standpoint, they did operate that way. Where the Corman Group president had control over the purse springs of the company. So the district court in this case viewed the Supreme Court precedent, the Union Stockyards case and the terminal case from Galveston, and even the East Brooklyn case very narrowly, very narrowly. When we all know and recognize that the scope and the remedial nature of FILA would require a broader view and a larger scope than what the district court was willing to review in those cases. Your honors, based on all of those arguments and the others that are in the brief, the appellant, Joseph Brent Mattingly, would respectfully request that this court reverse the decision of the district court and remand this case for further proceedings. Thank you. May it please the court, counsel, Mr. and Ms. Mattingly. My name is Blaine Lewis and I represent the Corman entities in this case. Let me start out by saying, to answer Judge Davis's question, it is absolutely the law that railroads may contract out for certain types of services on their railroads. We've cited a litany of cases addressing that issue, and I'll discuss them in some detail a little bit later, but those would include the Kelly case, Campbell case, Thomas, Zeller, Royal and Sullivan cases. We would respectfully take the position that the district court decision dismissing the appellant's FELA claim should be affirmed for two central reasons. The court correctly held that Mr. Mattingly was not a borrowed servant and that services was not a subservient company under Kelly and its progeny. The court correctly also rejected appellant's unitary operation theory because services is not and could not be a physical link in the transportation system. So under the Kelly analysis, I'm sorry, I know that you've got a plan there, but can you flip it maybe and go to the unitary services? Yeah, absolutely. So under the unitary operation cases, the main case there is the Southern Pacific case, and in that case, as Judge Hood described and as is addressed in the Kuronsky case, establishes that in order for a non-carrier to be deemed a carrier under the ICC, there has to be the establishment of a physical link within the transportation system. And that's consistent with the Supreme Court case of Edwards, which defines a common carrier as carrying for the public and that definition is, quote, enforced by the mention of cars, engines, track, roadbed and other property pertaining to a going railroad. It's notable that services owns no property. Services owns no track. In the Southern Pacific case, Southern Pacific owned the railroad, it owned the steamship company, it owned the terminal, and the terminal was at question as to whether that was a common carrier. The terminal itself owned the track through which it was the only way of ingress and egress from the docks where the steamships were. So you had a terminal that provided the sole method, sole link, linking the railroad and the steamships. And so for that reason, in that case, the terminal was deemed a physical link. And so as the court held in this case at page 1617, that group is not using services as a physical link in a physical transportation system and, quote, not actively united Memphis line and services so that services is a necessary link in the chain of transportation. And so the cases in the Southern Pacific line of cases, including Keransky v. Wyandotte, which is a Sixth Circuit case, all held that, if you look at those cases, that there is some essential physical link making the non-carrier a carrier. I understood Mr. Mattingly, this is not exactly what he said, but I understood him to be arguing essentially that the district court's narrow view of this was really out of line with the vast majority of the precedent, or perhaps all the other precedent, which under these circumstances would have likely held the plaintiff entitled to feel. Do you agree with that? I do not, Your Honor. Using the unitary... What authority would you cite to say that he's incorrect about that? Well, I would cite the Keransky case, which goes through these ICC cases, which establishes that  under this unitary operation theory to be deemed a carrier, it needs to be part of establishing a physical link. And the other line, the other sort of borrowed servant analysis, I would cite to a whole line of cases, the Campbell v. BNSF case, where hostlers working at the BNSF terminal for a company called PRS were in an accident together, and those were analyzed as not being regular employees because there was not significant supervisory control over those employees by the BNSF. That's a Sixth Circuit case, and that included where those employees were required to adhere to BNSF safety protocols. The Zeller case, the Sixth Circuit case, is another subsidiary employee of a railroad, the CN, claimed an assault, and it was deemed that there was no significant supervisory control over her, therefore she was not a FELA employee. In the Thomas v. UP case, an individual working for Repair One, as a bridge worker, fell and was injured. He was allegedly being directed by a UP employee named Mann, who advised him to redo some timbers. The court held there that the railroad had no right to hire or fire Mann or direct him exactly how to do the work, therefore he was not a FELA employee. And again, under the Barnes v. Chesapeake and Ohio case, the Kentucky case, it is well established that a railroad may contract out for these kinds of services. In the Royal case, an individual working for NARS was deemed not to be a FELA employee. In that case, NARS was supervising its own people, had the right to inspect, the railroad had the right to inspect, and that was deemed not the right to control the employee or be a supervisory role. In Sullivan v. Conrail, Your Honor, an employee working for PTL, a subsidiary of Conrail, was unloading auto racks, was deemed not to be a railroad employee under the FELA because Conrail did not have significant supervisory control over that individual to reach the level of master and servant. So there is a whole line of cases that we've cited, Your Honor, along those same lines. And what's important is that Mr. Mattingly himself, in his testimony, he testified that he supervised his own crew, that he was employed by services, that he used his own tools, selected the location of the work, he selected the methods and manner of the work, he kept the payroll, the hours, expense reports, and sent those to his services employees. And so, up the chain, when asked who he worked for, he said, I worked for, reported to Paul Childress, who was a services employee, and Dickie Dillon, who was up the chain, also a services employee. And it was notable that no one from Memphis Line was out on this job when it happened, when this accident happened. So if we accept that there was no supervisory link there, and if we circle back to the physical link, as I understand your argument, a physical link has to equal ownership of some physical part of the operations. Is that right? Well, I think for a non-carrier owner to, for a non-carrier to be deemed a common carrier, it has to be part, a physical link, and part of a transportation system. Yeah, so that's, and I want to tease out what that actually means, because the examples that you gave, and I'm familiar with those cases, all had to do with whether or not there was ownership of some physical part of the railroad operations. Here, we know that services is working on the bridges and the tracks, and providing services on these physical parts of the operations. It seems to me that Group wouldn't be able to run its railroads successfully, or its business would be substantially impacted if they weren't doing that work on these physical aspects of the railroad. You can contract out lots of things, you know, accounting services. Those aren't going to provide a physical link. But is the fact that they didn't have ownership the thing that makes that not a physical link? Well, I think that the physical link part means literally track and property, and so it actually is a linking. As in ownership? Well, I think that would be, that could, there needs to be ownership over something like that, but also the non-carrier entity needs to be actually able to physically link what an actual carrier. Is there language in the Supreme Court precedent? I'm sorry? Is there language in the Supreme Court precedent to which you would link that proposition that you just articulated? I believe that the Southern Pacific versus ICC case references that, and also, again, I would go back to the cases that have interpreted that, including the Sixth Circuit case of Keransky v. Wyandotte, where there is reference... Can you be a little more specific? I want to know where to look to find it. Okay. In the, I would look to the Watco case. I do not have a page number in front of me right now. I'm sorry about that. I can maybe try to find that. But there's another case called Watco that interpreted those as well, which talks about the necessary link being required. And that, again, is part of the unitary operation theory. And so under that analysis in the unitary operation, Judge Hood said, there is no category whereby a non-carrier maintenance and repair entity becomes a common carrier because its parent company owns subsidiaries that own railroad companies. Mr. Mattingly has not argued nor presented facts showing that services serves as a vital part of the common carrier system as a linking carrier. And that's the court's opinion at 22. Yeah, and to be clear, I don't think... Well, I can say certainly I'm not questioning the doctrine, so to speak, and the requirement of the linkage. I'm trying to tease out what linking actually means. I read those cases. And in those instances, there was some ownership of a piece of something that linked. But I'm just asking, does that mean that that's the only way that you can make that physical link? If you've got someone who is working on something physical that would seem to link, I mean, that tracks link, bridges link. Their work is... And their work is certainly integral to that. Right. Does that mean that can't be linkage? I believe so. I believe that there has to be... When we talk about physical link, we're talking about what we just talked about, about track, about property. I do not believe that just providing services, what would seem to be railroad-type services, maintenance, repair, whatever... On physical structures. On physical structures. I do not believe the case law holds that that is, quote, a physical link. And so... Well, but does the case law say the opposite? Does it say that that is affirmatively not enough for a physical link? I guess that's the... I guess I would turn to the other cases where... That I just was talking about, Thomas and Royal and other ones, where clearly individuals are working on physical railroad, and yet they are deemed, because they're not working for common carriers, they are deemed not to be FELA employees. So, it is permissible to have someone physically working on a railroad who is not a common carrier, the employer of that person is not a common carrier, and that person not to be a FELA-considered employee. That's absolutely the case under the litany, the line of cases that we've cited, and also the Barnes case, which it acknowledges that you may contract out. So, not every piece of timber that's cut and not every piece of rail that's laid for a railroad is necessarily being done by a FELA-covered employee that can be contracted out. Plaintiff has... Appellant, excuse me, has tried to argue something, sort of what you're alluding to, Your Honor, that if, by virtue of performing a necessary function on a railroad, that, therefore, that transforms railroad services into a common carrier. We find no support in the law for that, for that proposition. And, in fact, that would mean that there really are no non-FELA employees anywhere, because as soon as somebody touched a railroad to do work on it, they'd be deemed part of a common carrier. That's simply not the law. So, I would also turn to the Watco case, which we cited, which is remarkably similar to this situation. That employee, Watco, Inc., owned a mechanical side and a transportation side. Watco, the individual was injured while working on a covered hopper on the mechanical side, and the court held that simply by working on that car did not provide a link, did not make that a linking carrier and link those two such that Watco, Inc., would be a common carrier under the act and that the mechanical side would be a common carrier under the act. Neither was the case. So, in that situation, the individual was deemed also not to be a FELA-covered employee. I would touch briefly on this discovery issue and just note that at no time did the plaintiffs, when they were, the plaintiffs' aspect of the case, did they ask for more time for discovery or indicate that they needed and did not have enough proof to address some of these issues. And they failed to submit an affidavit to that effect. So, for those reasons, we would respectfully ask that the court affirm the trial court's decision. Thank you. Thank you. I want to first address, in part, the question that Judge Davis posed and, to some extent, Judge Gibbons as well, about what authority that there is that would limit or would purport to limit the expansive scope of the remedial nature of FELA. And the response to that by Corman was the Kuronsky case and a litany of other cases that were cited. But I would point out that the Kuronsky case was not a unitary operations case. In that case, there was not an argument that there was a holding company who controlled the operation of everyone else. Kuronsky was not a unitary operations case. And even though it provides some analysis that's important to the subservient argument, it is not a unitary operations case. Nor are those other cases that were cited, the Royal case and all of those. Those all deal with borrowed servant, subservient. They do not deal with the unitary operations principle. And under the rationale that Corman argues, then a railroad entity could carve out all manner of railroading services that are traditionally and historically part and parcel to the operation of a railroad and segregate those out. And because they don't own a locomotive or perhaps they don't own the tracks that they're working on, they could essentially eliminate FELA coverage. That's the argument that Corman is making that they are permitted to do by segregating their functions. When if you look at Corman Group, they own locomotives, they own track, they have bridge workers, they have track workers. This is a railroad. And for over a hundred years, we've not seen workers like Brent Mattingly denied FELA coverage because a railroad segregates its operations to defeat the expansive scope of FELA. The very work that Mattingly was doing, as we pointed out in some of the cases we've cited, is exactly what employees historically have resorted to FELA for a remedy. I think it's important also because the Corman focuses on Karonsky, which is not a unitary operations case, to go back and look at the Supreme Court precedent and in addition to the Union Stockyard case and the Southern Pacific Terminal case, the Brooklyn East case, which is also cited. And Brooklyn was a case that was decided under the Hours of Service Act. So it involved an employee, not some tariff that was being charged at the work. It was an employee case. And there was not ownership as we see in Corman Group or in the other cases. This was a terminal that owned no locomotives, that took product off of barges and loaded them onto cars supplied by 10 different railroads. They weren't connecting the railroads. And in that case, the court focused, as has been the case in all of these unitary operations cases, on the control, the nature of the work that's being performed by the employee and all of those things that are very consistent with what traditionally and historically workers like Brent Mattingly have performed. And Judge Davis's point is absolutely correct. You can't operate a railroad without tracks. And isn't the maintenance of those tracks integral? Doesn't it supply the link, the connection, with the entire system? And there's no question that Corman Group has a system. They've got railroads that run from Kentucky to Tennessee to Arkansas. The tracks and the maintenance of those tracks is absolutely essential. Thank you, Your Honors. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you.